IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 2, 2026

**STATE OF TENNESSEE v. BRUCE ALLEN IVY, JR.**

**Appeal from the Circuit Court for Carroll County**
**No. 21-CR-178      Bruce Irwin Griffey, Judge**

———————————————————

**No. W2025-00306-CCA-R3-CD**

———————————————————

A Carroll County jury convicted the Defendant, Bruce Allen Ivy, Jr., of rape of a child and two counts of aggravated sexual battery, and the trial court sentenced him to a total effective sentence of fifty-two years imprisonment. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. After review, we affirm the trial court's judgments.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL, SR., JJ., joined.

Samuel W. Hinson, Lexington, Tennessee, for the appellant, Bruce Allen Ivy, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Matthew F. Stowe, District Attorney General; and Michael Thorne, and Deven Whitfield, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The charges in this case arose after J.L. and S.L.[1] disclosed that their uncle, the Defendant, sexually abused them. In September 2021, a Carroll County grand jury indicted the Defendant for: one count of rape of a child for J.L., two counts of aggravated sexual battery for J.L. and S.L., and two counts of continuous sexual abuse of a child for J.L. and S.L.

---

[1] It is the policy of this court to protect the identity of minors. Therefore, we will identify the minors in this case by their initials.

**Trial.** The Defendant's jury trial occurred on June 24, 2024. J.L. testified that she was fourteen years old at the time of testifying and that the Defendant began touching her "private parts and titties" when she was nine years old. J.L. clarified that "private parts" meant her vagina. J.L. stated that, at the time of the sexual abuse, she was living with her mother, her siblings, and her uncle, the Defendant. She explained that the Defendant is her mother's half-brother, and that he and her mother have three children together; as will be discussed below, additional incest charges against the Defendant were subsequently filed.

J.L. stated that the first incident occurred in the bedroom she shared with her older sister, S.L. She explained that the room contained bunk beds, with her sleeping on the bottom bunk and her sister on the top bunk. She said that, while she was asleep, the Defendant entered her bedroom and began touching her vagina over her clothes. She stated that she woke up while he was touching her and told him to "get off [her]." The Defendant replied "okay" and immediately left the room. J.L. stated that she felt uncomfortable and scared and knew that "it was something that wasn't supposed to be happening." She explained that she was too frightened to tell anyone what had occurred. She also stated that S.L. was present in the room at the time of the incident.

J.L. described another incident that occurred when she was nine or ten years old. She stated that she was walking with the Defendant to E.W. James, a local store, when they stopped at an "old" and "broken-down" cabin in the woods. When she entered the cabin, she noticed that there was "trash everywhere." She stated that the Defendant sat on a chair while she sat on a stool, and that the Defendant made her touch his penis over his clothes. J.L. told the Defendant she "didn't want to do this," and the Defendant instructed her not to tell her mother. They then left the cabin and walked to the store.

When asked whether the Defendant touched her again, J.L. stated that she "just remember[ed] one more" time. On that occasion, J.L. and the Defendant were in the kitchen at night while the rest of the household was asleep. She explained that there were several cameras in the home, including in the kitchen, living room, and her mother's bedroom, and that the Defendant told her that he had turned them off. J.L. said that the Defendant instructed her to kneel while he stood in front of her and "made [her] suck his penis." The Defendant placed his hands on the back of her head so she could not move. J.L. recalled that the Defendant "tried to make [her] swallow his come" but she refused. She stated that she told the Defendant that she "[did]n't want to do this," and she left the kitchen. She estimated that the assault lasted four minutes.

Two days after the incident, J.L. told her sister, S.L., what happened in the cabin and the kitchen. She and her sister then told their brother, but he "didn't believe [them]." She said that on one occasion her father asked J.L. and S.L. whether the Defendant had ever touched them inappropriately and they answered "no." J.L. explained that she and her

sister were scared to tell their father. J.L. said that S.L. later told their cousin about the events, and the cousin informed their aunt, who then told their father.

J.L. stated that the Defendant was often affectionate with her in ways that she did not think was normal, including "touching [her] butt." J.L. confirmed that her testimony was truthful and that she had no reason to lie about what occurred. She also confirmed that no one had attempted to persuade her to lie about the incident or to refrain from testifying. J.L. acknowledged that her mother and biological father were separated but denied that she was giving her testimony in an attempt to get them back together. When asked if the person who touched her inappropriately and put his penis in her mouth was in the courtroom, she replied "Yes," and identified the Defendant.

S.L. testified that she was sixteen years old and that the Defendant began touching her when she was in the sixth grade. S.L. stated that the first incident occurred in her bedroom. At the time she was staying in her room by herself, in a single bed. She said that the Defendant came in while she was asleep and kept asking if she was awake. S.L. stated that she did not answer because she did not know why he was in her room. The Defendant then got in bed with her and she "had [her] arm around [the Defendant] on his chest." She said that the Defendant began to move her hand down and put it on his penis, which was out of his pants. She said that she moved her hand back up to put it on his chest, but the Defendant "just kept on putting it back" on his penis. She stated that when the Defendant realized she was not asleep, he told her not to tell her mom or her siblings what happened and left her room. S.L. said that she was afraid to tell anyone.

Months after the first incident, S.L. and the Defendant were walking to E.W. James store when the Defendant took her to a cabin behind the store. She described the cabin as old and having broken windows, and she recalled that it appeared someone had been living there because she saw food wrappers inside. When they entered the cabin, the Defendant attempted to get S.L. to sit on his lap, but she sat on two crates and the Defendant sat on a chair beside her. S.L. stated that the Defendant asked her to touch his penis, but she refused. S.L. stated that she could not remember whether she touched his penis, but she remembered that the Defendant urinated in front of her. After she refused, S.L. ran out of the cabin. The Defendant followed her, and they resumed walking to the store and "acted like nothing happened."

S.L. explained that the next incident occurred when the Defendant was cutting her hair in the kitchen of their home. She stated that the Defendant asked whether he made her feel uncomfortable, and she responded, "No." S.L. acknowledged that she lied to the Defendant because she "was scared to face him and tell him the truth." She confirmed that the Defendant did, in fact, make her feel uncomfortable. While the Defendant was cutting S.L.'s hair, he stood close behind her and began to "rub[] his penis on [her] booty." When

- 3 -

asked if she told the Defendant to stop, S.L. responded, "No. I acted like I didn't notice it." She stated that they both had clothes on and that the incident did not last a long time. S.L. also stated that any time the Defendant would hug her, he would touch her "butt" and "boobs."

When asked if she ever witnessed the Defendant inappropriately touch anyone else, S.L. stated the following:

[S.L.]: I watched him, um, touch my little sister, [J.L.], in my -- in our bedroom when we shared a room. We had bunk beds.

[STATE]: Okay. And when -- when you saw that, um, was the bunk bed incident that -- where you saw this, was this after the first incident with you in the bed?

[S.L.]: It was after the first and the second.

[STATE]: Okay. So, why did you go to sharing bunk beds with [J.L.]?

[S.L.]: Because I was scared. That's when me and my sister started sharing a room, because we told each other about our incidents.

[STATE]: Okay. So, you wanted to share a room with her?

[S.L.]: Mm-hmm.

[STATE]: Did that make you feel more -- safe?

[S.L.]: Yes, ma'am.

[STATE]: Okay. What did you -- what did you see?

[S.L.]: I saw him touch my sister in her private area –

[STATE]: When --

[S.L.]: -- while she was asleep.

[STATE]: When you say private area, what do you mean?

[S.L.]: Her vagina.

- 4 -

[STATE]: Okay. And this incident, did you -- was your sister awake or was she asleep?

[S.L.]: I felt like she was up, but she looked like she was asleep.

[STATE]: She looked like she was faking sleep?

[S.L.]: Yes, ma'am.

[STATE]: Okay. When you saw him touch her, was it over the clothes or under the clothes?

[S.L.]: She didn't have no, uh, clothes on. She didn't have no underwear, or no shorts, or nothing on.

[STATE]: Okay. Why was that? Was that normal?

[S.L.]: Um, yes, ma'am. Sometimes she would -- she would overheat at night, so she would not wear no, um, pants to sleep.

. . . .

[STATE]: What did, uh, what did [the Defendant] do -- I mean, did you -- what made him stop?

[S.L.]: He just ended up stopping on his own.

[STATE]: Okay. And what happened after he stopped?

[S.L.]: He left the room, then me and my sister -- we ended up talking about it the next morning.

S.L. stated that, to her knowledge, the Defendant only inappropriately touched her and J.L., but not her other siblings. When asked why she decided to come forward about the incidents, S.L. stated,

My father asked me out -- me and my sister -- outside about it one day, and I ended up lying to him and told him that -- because he said he had a feeling Bruce had been touching us. And I told him that it wasn't true. And then

- 5 -

my cousin -- my -- my oldest, uh, my oldest cousin, [] -- me and him are the closest, and he asked me was it true. And so, I told him.

. . . .

After my -- after my aunt and my dad found out, my dad took us to, um, some some place to talk to some people.

S.L. stated that she had been in contact with the Defendant following his indictment through jail phone calls and letters. She stated that they had spoken by phone eight or nine times. When asked whether the calls came from the Defendant's jail phone account, S.L. stated that the calls came from the Defendant's cellmate's jail phone. When asked whether the Defendant was supposed to be contacting her, S.L. responded,

[S.L.]: There was a no -- there was a no-contact order, but [the Defendant] said that his lawyer said that there was, uh, there wasn't a no-contact order.

[STATE]: So, basically, he told you it was okay for him to be talking to you?

[S.L.]: Yes, ma'am.

. . . .

[STATE]: Okay. And in those phone calls, has [the Defendant] ever talked to you about trial, about testifying?

[S.L.]: Yes, ma'am.

[STATE]: What did he tell you?

[S.L.]: He wanted me to get on the stand and lie and say that I was peer pressured into saying that stuff about him.

[STATE]: Okay. So, he wanted you to -- he wanted you to lie?

[S.L.]: Yes, ma'am.

[STATE]: Okay. What'd you tell him? Did you say, "Yeah, I'm going --"

[S.L.]: Yes, I went along with it.

[STATE]: Okay. And did he ever say anything to you about just getting up here and staying silent?

[S.L.]: No.

[STATE]: Okay. On the phone -- so he you had phone calls. These are recorded, right?

[S.L.]: Yes, ma'am.

[STATE]: Okay. Did he ever once accuse you of lying?

[S.L.]: No, not to me, no.

[STATE]: Okay. Did he ever once ask you why you were lying?

[S.L.]: No.

[STATE]: Okay. Has he ever said anything, trying to get you on his side?

[S.L.]: No, other than -- uh, the only thing really -- he asked if I still trust him.

[STATE]: Okay. Do you?

[S.L.]: No.

S.L. confirmed that her testimony was truthful and that she had no reason to lie about what occurred. When asked if her testimony was given as a "ploy to get [her] mom and dad back together," S.L. stated, "No. I don't want my parents back together." When asked if the person who touched her inappropriately and made her touch his penis was in the courtroom, she replied "Yes," and identified the Defendant.

On cross-examination, S.L. denied telling J.L. what to say about the Defendant's actions. When S.L. was presented with text messages between her and her mother, the following exchange occurred:

[Defense Counsel]: Okay. Do you see -- and just – 'cause they're not numbered -- the top of this page right there -- do you see that's a text message from you to your mother, right?

[S.L.]: Yes, sir, it is.

[Defense Counsel]: Okay.  And in that text message, you tell your mother that you told [J.L.] to say she didn't know anything about this.  Is that right?

[S.L.]: That who didn't?

[Defense Counsel]: That your -- that your mother didn't know anything about this, and that he don't --

[S.L.]: That's what it says in the message, yes.

[Defense Counsel]: Okay.  It also says that, uh, you told [J.L.] that he don't, uh, tell -- I guess -- your mother, uh, or whoever well, tell law enforcement -- I guess -- is who you're referring to -- that [the Defendant] only touched your butt one time. Is that also right?

[S.L.]: That's what it says in these messages.

[Defense Counsel]: Okay.

. . . .

[Defense Counsel]:  So, at least according to these messages, [S.L.], it would appear that you did tell [J.L.] what to say.  Is that, at least --

[S.L.]: That's what I told my mom.

On redirect examination, S.L. acknowledged that she told J.L. to say that their mother "knew nothing about anything."  She stated that she did so to protect their mother. She clarified that she did not tell J.L. what to say about the Defendant's conduct, only what to say regarding their mother's knowledge.

Jasmin Powell, a criminal investigator with the McKenzie Police Department, testified that she was the primary investigator in this case.  Investigator Powell stated that she began the investigation when another agency in Indiana alerted her about "females that had disclosed sex abuse that had occurred in our jurisdiction."  Investigator Powell stated that, because the two victims were staying with a family member in Indiana, the Indiana agency conducted the forensic interviews of the victims and provided her with all related documentation.  Investigator Powell stated that, in the forensic interviews, both J.L. and

S.L. made disclosures of sexual abuse by the Defendant. Investigator Powell confirmed that the victims' disclosures were consistent with their testimony at trial.

Investigator Powell stated that she interviewed the Defendant after he was arrested for incest arising from a sexual relationship with the victims' mother. Investigator Powell explained that there were "multiple facets" to the investigation, so the interview included both questions about the incest charges and sexual abuse allegations. The recorded interview was admitted into evidence and shown to the jury.[2] Investigator Powell stated that the beginning of the recording shows the Defendant signing a <u>Miranda</u> warning waiver that was admitted into evidence. Before questioning, the Defendant yawned and Investigator Powell asked the following:

Q:  Too early for you?
A:  No. Times just a little messed up.
Q:  In the jail?
A:  [Nods Head Yes].
Q:  Yea. I hear that a lot. Does your pod have any windows or anything?
A:  It does, but we are hardly out. For two hours at a time.

During the interview, the Defendant made several admissions regarding the sexual abuse of J.L. and S.L. When the Defendant was asked if he ever inappropriately touched J.L. or S.L., the following exchange occurred:

A:  I would give [S.L.] a hug and then when I would break away from the hug sometimes, I would slide my hand down her back and across her butt.
Q:  Is this [S.L.] or is this [J.L.]?
A:  [S.L.].
Q:  Okay.
A:  Sometimes I would break off to the side and my hand would go across her chest.

. . . .

Q:  What happened with [J.L.]?
A:  I never touched [J.L.] under her clothes. But I have touched her between her legs.

---

[2] The record does not contain a transcription of the interview. Although we have listened to the recording for purposes of appellate review, we note that it is of low quality, the audio cuts off spontaneously throughout, and it is difficult to understand. Whenever accuracy is questionable, we note it in our recitation of the recording.

Q:	Okay.  Were her clothes on or off when you touched her between her legs?

A:	On.

Q:	Was she awake or was she sleeping?

A:	Awake.

Q:	Okay.  When was this?

A:	I don't know exactly.

. . . .

Q:	I think we have a couple more big truths to get out.  Okay.  With [J.L.].  I know you didn't rape them and I know you love them.  But I know something happened in the kitchen.  And you said the girls that they said something they were probably telling the truth on it and you just don't remember it.  Okay.  She's saying that she gave you head in the kitchen.

A:	[Shakes head no]

Q:	Did she give you head somewhere else?

A:	 No.

Q:	[Audio cuts out].  --penis.

A:	Yes.

Q:	Inside of your clothing?

A:	Yes.  In the kitchen.

Q:	Okay.  Was it after that?  That that happened?  We're being so honest [Defendant].  And everything that you've said they've said too.  So why would they make up one portion of it?

A:	I don't know.

Q:	I don't think they did.  You didn't rape these girls.  Okay?

A:	Well I didn't rape them but . . .

Q:	No, I know you didn't rape them.  But yes, [J.L.] gave you head in the kitchen?

A:	Yes.

Q:	Okay.  Can you tell me about it?

A:	It only lasted a couple seconds.

Q:	Okay.  Because you stopped it or she stopped it?  [Audio cuts out] -- if you know that that was wrong.  Do we need to take a break?

A:	There's no point in taking a break.

. . . .

Q:     So can I walk through the -- and make sure I understand you?  So there was a time that you put your hand between [J.L.]'s legs and there were times when they touched you.  Outside and inside of your pants?  Both?

A:     [Shakes head no].  [S.L.] never touched me at all.

Q:     Okay.  So the only thing with [S.L.] was you rubbing her butt and her breasts?

A:     Yes.  Not exactly rubbed it but like…

Q:     Like brushing across?

A:     Yes.

Q:     Okay.  And then with [J.L.], the head in the kitchen.  And then she touched you inside and outside of your pants.  And then the one time you touched her between her legs.  Is that right?

A:     Yea.

. . . .

Q:     Do you know about how many times this happened?  Or. . .

A:     A handful of times.

Investigator Powell explained that there was not any physical or scientific evidence in this case because,

a delayed response means that evidence is likely lost in the amount of time that goes past.  So, DNA evidence, for example, on a sexual assault case with a sexual assault kit only lot -- lasts a short period of time.  And if you don't have that kit completed within seventy-two hours, um, your body naturally gets rid of it through showers and other scientific things.

When asked if there would have been DNA evidence if the sexual assault had been reported the same day that a rape kit was done, Investigator Powell stated,

At the risk of sounding crass, unless he had ejaculated at the time of the oral sex, it would be -- or if she had bitten him or something like that -- it would be very unlikely, in my opinion, that there would have been DNA located in her mouth because of the saliva and everything.  And her standard would be overpowered to that standard.

On cross-examination, Investigator Powell acknowledged that she was aware that J.L. and S.L. did not make any disclosures until after they moved to Indiana to live with

their father. When asked if she was aware that the victim's father had made false allegations to the Department of Children's Services ("DCS") in the past, Investigator Powell stated that she was and that she had investigated it. She said that, because the DCS hotline is anonymous, there was "no way to determine who the caller on a case actually is. So, it could have been him. Or, it could have been somebody else . . . a schoolteacher or something like that." Investigator Powell acknowledged that the victims initially denied that anything had happened to them when questioned but later changed their story. She explained that "[i]t's pretty common in cases like this."

Investigator Powell confirmed that the Defendant told her that, on one occasion, he took four sleeping pills, woke up at approximately 1:00 a.m., and then took four more sleeping pills. She stated that the Defendant told her that he had a "high tolerance for medication." When asked if she would have conducted the interview if she believed the Defendant was impaired, Investigator Powell responded, "No, if he appeared to be heavily impaired to the point where I didn't feel like we would be able to have a solid interview, I would have waited and came back."

On redirect examination, Investigator Powell stated that the Defendant's disclosures and the victims' disclosures were consistent and that the Defendant's confession corroborated the allegations made by the victims. She stated that, although the Defendant disclosed only a limited amount of information, such limited disclosures are common in confessions because suspects are asked to "bear their soul and tell the -- their deepest, darkest secrets."

Victoria Davis, an investigator employed by the Tennessee Department of Children Services ("DCS"), testified that, on June 2, 2021, a call came in on their hotline with allegations of child sexual abuse involving J.L. and S.L. and identified the Defendant as the perpetrator. After the Defendant spoke with Investigator Powell, Ms. Davis conducted an interview with the Defendant which was recorded and shown to the jury. Ms. Davis testified that the Defendant admitted that he "f**ked up" and that "if [the victim's mother] would have known what happened, that . . . she would have killed him in his sleep." She said that the Defendant also told her that "the oldest two boys, [] , would hate him forever, or hate him after that. . . . because of what happened, and that he didn't know why he'd done it, and that it was stupid." Ms. Davis stated that the Defendant expressed regret for his actions.

The victims' mother and the Defendant's half-sister ("Mother"), testified that the first time the victims made any allegation of sexual abuse was in 2021 when they went to Indiana to visit their aunt and grandmother. She stated that the victims' father also lives in Indiana and that they were allowed to see him. Mother said that, prior to going to Indiana, the victims never mentioned any allegations of sexual abuse. She stated that she did not

notice anything unusual about the victims while they lived with her and the Defendant, and that the victims did not behave unusually around the Defendant. Mother explained that, from her understanding, the Defendant "didn't treat [the victims] any different than he did his son at the time, or his daughter," and that they "got along good."

The Defendant testified that J.L. and S.L. lived with him for six or seven years and he acted as their father during that time. When asked why the victims moved to Indiana, the Defendant stated,

> They -- we had a disagreement -- me, their mother, and the two girls, um, because I wouldn't let them out past 9:30 in the projects in McKenzie, for obvious reasons. Um, it's -- I had, uh, their -- I monitored their Snapchat -- or, not their Snapchat, their, uh, uh, uh, TikTok – that's what it was. Um, any videos that I didn't like, you know, flipping people off; excuse my language, shaking their ass. Stuff like that, I had made them delete and took the app from their phone -- for a period of time.
>
> Um, and then they thought it was bad living with us. So, we -- me and [Mother] agreed that they could go visit with their aunt and their, uh, grandmother, and see how their dad was.

The Defendant said that the victims made their allegations against him when they were living in Indiana with their aunt, grandmother, and father. When asked about his relationship with the victims' father, the Defendant explained that their father "absolutely detests [him]" because he had convinced Mother to leave him. The Defendant stated that he was aware of the allegations the victims made against him and asserted that he would never do anything like that.

The Defendant stated that, upon learning that his children were taken by DCS, he took "a hundred and seventy something" sleeping pills in "an attempt on [his] life." Afterwards he went to the hospital because he was "hallucinating" and "severe[ly] dehydrat[ed]." The Defendant stated that when he got out of the hospital and returned to McKenzie, he turned himself in to the police. When asked whether he had taken medication on the day he was interviewed by Investigator Powell, the Defendant stated that he was "not entirely sure" and that he did not remember giving the interview.

On cross-examination, when asked if the sleeping pills made him tell the investigator he was fine at the beginning of the interview, the Defendant responded, "I don't know." The Defendant acknowledged that the details of his confession were consistent with the victims' testimony. When asked to explain why the accounts of what

happened were so similar, the following exchange occurred between the Defendant and the State:

[STATE]: Okay. So, you're saying that you, under the influence of hundreds of medication and sleeping pills, managed to fabricate a story that identically lined up with the two girls that you hadn't talked to about this with. How is that possible? Tell me as I stand here.

[DEFENDANT]: I knew about the allegations beforehand.

[STATE]: The allegations -- that's fine. But the specific details about you putting your penis inside of [J.L.]'s mouth, which you admitted to -- you're saying that you fabricated that based off of the influence of hundreds of sleeping pills.

[DEFENDANT]: I'm not saying that I fabricated it –

[STATE]: So, you were lying?

[DEFENDANT]: -- but –

[STATE]: So, you're -- you're saying you didn't just make it up. But that's -- 'cause, that's what you're basically saying.

[DEFENDANT]: I don't know what I did or said in the video. I -- I don't remember that. I have no knowledge of that.

[STATE]: So, you're saying –

[DEFENDANT]: As far –

[STATE]: -- it could all be true, that you just don't remember that you actually touched [J.L.], that you touched her vagina, or that you put your penis in her mouth. So, you're saying it could be true?

[DEFENDANT]: No.

[STATE]: So, you're saying it's not? Your story is not –

[DEFENDANT]: I'm saying –

- 14 -

[STATE]: -- adding up.

[DEFENDANT]: I'm saying it couldn't be true.

[STATE]: It couldn't be true.  But you just said that you're not saying that you fabricated that.

[DEFENDANT]: I did not fabricate it.

[STATE]: Okay.

[DEFENDANT]: I heard from [the victims' father] the allegations.

[STATE]: Okay.

[DEFENDANT]: He called me and [Mother] before he called anybody else. We told him to go get the girls checked, to take them to the emergency room, which there is reports that state that.

. . . .

[DEFENDANT]: I don't know what happened during that interview.

[STATE]: You saw the interview.

[DEFENDANT]: I have no remembrance for myself.

[STATE]: You seemed well-spoken, articulate; you spoke about your family, your family tree, for forty-five minutes with the investigator.  And you never slurred a word.  Did you hear yourself slur your words?  Yes or no.

[DEFENDANT]: No, ma'am.

[STATE]: Okay.  You didn't overdose in there; you didn't fall on the floor, foaming at the mouth -- what one would expect from taking hundreds of sleeping pills; you didn't do that.  Did you see that on the film?

[DEFENDANT]: The, uh, point in time that I took hundreds –

[STATE]: That was a yes or no question.  Did you see that on the film?

[DEFENDANT]: No, ma'am.

- 15 -

[STATE]: Okay. The investigator didn't have to perform any kind of life procedures because you tried to overdose while you were in that -- in that room, did she?

[DEFENDANT]: No, ma'am.

[STATE]: Okay. And at the beginning of that video, you said you'd took four pills, four sleeping pills, but you have a high tolerance for medication; that's what you said. Okay.

[DEFENDANT]: Yes, ma'am.

[STATE]: But your -- but your story here, as we stand, is that you took hundreds of sleeping pills, and that you just don't remember that.

[DEFENDANT]: A hun -- a hundred and seventy something sleeping pills.

. . . .

[STATE]: On the video, [Defendant], you admit to touching the girls, hugging them, touching their butt, touching their breasts. But as you sit here today, you're saying that didn't happen.

[DEFENDANT]: Yes.

[STATE]: Okay. So, we should believe the you today, not the you on that video?

[DEFENDANT]: Correct.

[STATE]: Because of an incident of medication. That's what you're saying?

[DEFENDANT]: Yes, ma'am.

[STATE]: Okay. And you, very specifically on the video remembering that -- you putting your penis inside of her mouth only lasted a couple of seconds in the kitchen, which you verified for the investigator, yes, that is where it happened – you're saying as you stand here today, that that you don't remember that happening, and that it's not true.

[DEFENDANT]: Correct.

- 16 -

The Defendant admitted that he spoke with [S.L.] several times on the phone after being indicted. When asked if he violated the condition of his bond by speaking with [S.L.], the Defendant stated that he did not violate his bond because he was not on bond at the time. The Defendant stated that he could not remember what he said during the phone calls and could not recall whether he told S.L. to say that she had been pressured into testifying and to remain silent.

On redirect examination, the Defendant maintained that he did not remember the interview with Investigator Powell and attributes his memory loss to the sleeping pills he took.

Based on this evidence, the jury convicted the Defendant of rape of a child and two counts of aggravated sexual battery.[3] The trial court imposed an effective sentence of fifty-two years imprisonment. On March 4, 2025, the Defendant filed a motion for new trial, which the court denied by written order. This timely appeal followed.

## ANALYSIS

The Defendant contends that the evidence is insufficient to support his convictions. Although the Defendant was convicted of three offenses—rape of a child and two counts of aggravated sexual battery—it is unclear which conviction he contests. In addition, rather than challenge any particular element of the offenses of conviction, the Defendant attacks the credibility of the victims' testimony as "problematic" and "inconsistent" and asserts that his confession was not reliable because he had taken several sleeping pills prior to the interview. The State responds that the evidence was sufficient to support each of his convictions. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that

---

[3] The State dismissed both counts of continuous sexual abuse of a child before trial.

evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Rape of a child is defined as the unlawful sexual penetration of a victim by the accused where the victim is more than three years old but less than thirteen years old. Tenn. Code Ann. § 39-13-522(a) (2019). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital . . . openings of the victim's . . . body [.]" Id. § 39-13-501(7). In order to find a defendant guilty of rape of a child, the State must prove beyond a reasonable doubt: (1) that the defendant had unlawful sexual penetration of the alleged victim or the alleged victim had unlawful sexual penetration of the defendant; (2) that the alleged victim was more than three (3) years of age but less than thirteen (13) years of age; and (3) that the defendant acted either intentionally, knowingly or recklessly. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 10.12.

Our supreme court has determined that the testimony of a child victim, alone, is sufficient to uphold a conviction for child rape. State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003); see State v. Warren Curnutt, No. M2006-00552-CCA-R3-CD, 2007 WL 1482390, at *11 (Tenn. Crim. App. May 22, 2007). Thus, neither physical evidence nor corroborating testimony is necessary to support a conviction of rape of a child. See State v. Benton, No. W2016-00323-CCA-R3-CD, 2016 WL 4706850, at *5 (Tenn. Crim. App. Sept. 6, 2016) (stating, "[t]his court has repeatedly said that the State is not required to present physical evidence to corroborate a victim's testimony [in rape of a child cases]") (collecting cases); State v. Cox, No. W2014-00800-CCA-R3-CD, 2015 WL 3796463, at *8

(Tenn. Crim. App. June 17, 2015) (rejecting defendant's attacks on child rape victim's credibility and emphasizing that "the testimony of a child victim, alone, is sufficient to uphold a conviction for child rape") (citing Elkins, 102 S.W.3d at 582-83).

Aggravated sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [where] [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "Sexual contact" is statutorily defined to include:

> the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

Id. § 39-13-501(6). "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Id. § 39-13-501(2). "'Intentional' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" Id. § 39-11-106(a)(18) (Supp. 2011).

Viewed in the light most favorable to the State, the proof fully supports the Defendant's convictions for rape of a child and two counts of aggravated sexual battery. For the rape of a child offense, J.L. testified that, when the rest of the household was asleep, the Defendant forced her to perform fellatio on him in the kitchen of their home. She stated that the Defendant made her kneel while he stood in front of her and put his penis in her mouth. The Defendant placed his hands on the back of her head and held it so she could not move. She estimated that the assault lasted four minutes. In his interview with Investigator Powell, the Defendant admitted that he forced J.L. to perform fellatio on him in the kitchen and that it "only lasted a couple seconds."

Regarding the aggravated sexual battery offense against J.L., J.L. testified that the Defendant entered her bedroom one night, got into bed with her, and began touching her vagina over her clothes. She then woke up while he was touching her, told him to "get off [her]" and the Defendant left the room. S.L. also testified that she witnessed the Defendant enter J.L.'s bed and touch her vagina. On another occasion, J.L. stated that the Defendant took her to a cabin while they were walking to the E.W. James store and forced her to touch his penis over his clothes. J.L. also stated that the Defendant was often affectionate with her in ways that she did not think was normal. She stated that the Defendant would often hug her and "touch[] [her] butt." The Defendant admitted that he touched J.L. in between

her legs and forced her to touch his penis and that it occurred "a handful of times." He also admitted that he would touch J.L.'s butt and breasts when hugging her.

Regarding the aggravated sexual battery offense against S.L., S.L. testified that the Defendant entered her bedroom one night, got into bed with her, and forced her to touch his penis, which was outside of his pants. She stated that she moved her hand away, but the Defendant kept putting it back on his penis. S.L. recalled an incident when the Defendant stood close behind her while cutting her hair and began to "rub on [her]" and "rub[] his penis on [her] booty." She also stated that anytime the Defendant would hug her, he would touch her butt or breasts. The Defendant admitted that he would touch S.L.'s butt and breasts when giving her a hug.

In his challenge to the sufficiency of the evidence, the Defendant generally attacks the credibility of the victims. First, he contends that neither victim made any sexual abuse allegations prior to moving to Indiana with their father, who purportedly "hated" the Defendant. However, the jury as the trier of fact evaluates the credibility of the witnesses, determines the weight given to witnesses' testimony, and reconciles all conflicts in the evidence. Campbell, 245 S.W.3d at 335 (citing Byrge, 575 S.W.2d at 295). This court does not re-weigh the evidence or substitute our inferences for those drawn by the jury. See Wagner, 382 S.W.3d at 297 (citing Bland, 958 S.W.2d at 659).

Next, the Defendant contends that S.L.'s testimony was inconsistent because she testified that she never told J.L. what to say regarding the allegations. The Defendant asserts that this testimony conflicted with text messages between S.L. and Mother in which S.L. stated, "But I told [J.L.] to say u [sic] knew nothing about anything." Although the Defendant argues that this message shows S.L. told J.L. what to say about the allegations, the message instead indicates only that S.L. told J.L. to say that their mother knew nothing about the allegations. Nothing in the messages, or elsewhere in the record, suggests that S.L. told J.L. what to say about the Defendant's conduct. Furthermore, the record shows that, during cross-examination, the Defendant questioned S.L. about the messages. Any inconsistency in the victim's testimony was squarely presented to and rejected by the jury as was their prerogative. See State v. Elkins, 102 S.W.3d, 582-83 (Tenn. 2003) (concluding that the evidence was sufficient to support the conviction for rape of a child because the inconsistencies in the victim's testimony "were not such as to create a reasonable doubt as to the defendant's guilt on the child rape charge"); State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996) (holding that inconsistencies in the evidence are resolved by the trier of fact); Byrge, 575 S.W.2d at 295 (reiterating that "the weight and credibility of testimony of a witness, and the reconciliation of conflicts in testimony, are matters entrusted exclusively to the jury as the triers of fact").

Finally, the Defendant argues that the confessions he made during the interview with Investigator Powell "cannot be relied upon" because "he had taken over 100 sleeping pills." To the extent that the Defendant seeks to challenge the voluntariness of his statement, the record shows the Defendant did not file a motion to suppress his statement to Investigator Powell, and he did not raise this issue in his motion for new trial. "Our appellate courts have consistently maintained that we will not entertain new issues on appeal when the trial court was not presented with an opportunity to consider those issues in the first instance." State v. Avant, No. W2018-01154-CCA-R3-CD, 2019 WL 3072131, at *6 (Tenn. Crim. App. July 12, 2019); Tenn. R. App. P. 36(a); State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) ("Ordinarily, issues raised for the first time on appeal are waived."). As a result, the Defendant has waived our consideration of whether the trial court erred in admitting evidence of his confessions.

Waiver notwithstanding, it was the jury's prerogative to reject the Defendant's testimony that he ingested sleeping pills prior to giving his confession thereby rendering it involuntary. During the hour and a half long interview, the Defendant is shown on video clearly and coherently discussing several topics ranging from his childhood, family background, and his children and their accomplishments. The Defendant did not slur his words or behave in a manner suggesting impairment. The Defendant provided a narrative of past events and stated his own participation in the offenses that was consistent with the version of events provided by the victims in this case. Investigator Powell testified that the Defendant did not appear to be impaired and that she would have terminated the interview had he appeared to be under the influence. At most, the Defendant yawned occasionally and complained of being tired due to jail conditions. When asked whether he had taken medication on the day of the interview, the Defendant stated that he was "not entirely sure." Assuming the Defendant had ingested sleeping pills, the video clearly shows that it did not render his confession involuntary. See State v. Morris, 24 S.W.3d 788, 805 (Tenn. 2000) (quoting State v. Robinson, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980)) ("It is well established that '[t]he ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary,' unless the suspect's faculties were 'so impaired that the confession cannot be considered the product of a free mind and rational intellect.'").

Based on the above evidence, a rational jury could have found beyond a reasonable doubt that the Defendant committed rape of a child and two counts of aggravated sexual battery. Accordingly, we conclude that there was sufficient evidence to sustain the Defendant's convictions, and he is not entitled to relief.

## CONCLUSION

Based on the above reasoning and authority, we affirm the judgments of the trial court.

s/ **_Camille R. McMullen_**
CAMILLE R. MCMULLEN, JUDGE